Jenny MANYBEADS, et al., Plaintiffs,

v.

UNITED STATES of America, et al., Defendants.

Civ. No. 88–410.

United States District Court,
D. Arizona,
Prescott Division.

Oct. 20, 1989.

OPINION AND ORDER DENYING
PRELIMINARY INJUNCTION
AND DISMISSING ACTION

CARROLL, District Judge.

Plaintiffs (47 in number) are Navajo Tribal members residing on that part of the Hopi Indian Reservation identified as Hopi Partitioned Lands (HPL) and subject to relocation from that reservation pursuant to the provisions of the Navajo–Hopi Land Settlement Act, 25 U.S.C. § 640d *et seq.*, Pub.L. 93–531, Dec. 22, 1974, 88 Stat. 1712, and as subsequently amended.[1]

Defendants are the United States of America, Donald P. Hodel, in his official capacity as Secretary of the Department of Interior, United States Department of the Interior, Ross O. Swimmer, in his official capacity as Assistant Secretary of the Department of the Interior, United States Bureau of Indian Affairs, Hawley Atkinson, in his official capacity as Chairman of the Navajo–Hopi Indian Relocation Commission and the Navajo–Hopi Indian Relocation Commission.

Plaintiffs assert seven reasons (claims) why they, and other Navajo Tribal members residing on the Hopi Reservation and with similar religious beliefs and practices, have the right for themselves and their heirs in perpetuity, to reside on the Hopi Reservation on what they consider their extensive customary use areas, with unlimited grazing privileges, the right to construct such buildings as they wish, and to utilize unlimited water claimed necessary to their needs:

*First Claim* —Violation of Right to Free Exercise of Religion;

*Second Claim* —Violation of the American Indian Religious Freedom Act;

*Third Claim* —Violation of Equal Protection;

*Fourth Claim* —Violation of Federal Trust Responsibility;

Lee Brooke Phillips, Matt Strassberg, Big Mountain Legal Office, Flagstaff, Ariz., Terry Gross, Rabinoitz, Boudin, Standard, Krinsky & Lieberman, New York City, Bruce Ellison, Rapid City, S.D., for plaintiffs.

Richard S. Alleman, U.S. Atty., Phoenix, Ariz., Steven Carroll, U.S. Dept. of Justice, Land & Natural Resources Div. Indian Resources Section, Washington D.C., for defendants.

1. This action was originally filed January 26, 1988 in the United States District Court for the District of Columbia. The case was transferred to this district on defendants' motion. Judge Gesell concluded at pg. 5 of the transfer order, "That there are therefore, strong policy reasons to have all aspects of the Hopi–Navajo controversy coordinated and resolved in a single federal district. Congress has recognized this through the statutory scheme it enacted and the dictates of judicial economy and common sense so require."

*Fifth Claim*—Violation of Right to Freedom of Religion under Customary International Law and the United Nations Charter;

*Sixth Claim*—Violation of International Prohibition Against Genocide;

*Seventh Claim*—Violation of Plaintiffs' Rights Under Article 73 of the United Nations Charter as a Non–Self–Governing People.

Plaintiffs seek a declaratory judgment establishing each of these claims, as well as injunctive relief:

Preliminarily and permanently enjoining defendants from relocating plaintiffs, from interfering with structures essential to plaintiffs' religious practices, from threatening or harassing plaintiffs, from disrupting plaintiffs' water supply, from interfering with plaintiffs' livestock and housing, from engaging in behavior or activities which coerce plaintiffs to leave their ancestral homelands, and from engaging in or authorizing programs or other actions which deprive plaintiffs of the livestock and housing necessary to sustain themselves on their ancestral homelands.

Defendants filed a Motion to Dismiss which has been fully briefed and is pending decision by this Court.

Plaintiffs' Application for a preliminary injunction was heard October 4, 5, 6 and 7, 1988. The evidence presented in *Attakai v. United States*, CIV 88–964 PCT EHC, has been incorporated in this proceeding. The parties have each filed proposed findings of fact and conclusions of law and post hearing briefs.

The motions to dismiss and for a preliminary injunction involve common issues and accordingly this Order will address both motions. For the reasons set forth in this Order, the Motion for a Preliminary Injunction will be denied and defendants' Motion to Dismiss will be granted.

1. *Plaintiffs Have No First Amendment Claims*

■ The Free Exercise Clause of the First Amendment is the putative basis for plaintiffs' claims that the Navajo–Hopi Re-location Act is unconstitutional and that they have the right to remain in perpetuity on property held in trust by the United States for the exclusive use of the Hopi Tribe. If there was ever any basis for asserting such contentions (see *Bowen v. Roy*, 476 U.S. 693, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986)) they were put to rest by the United States Supreme Court in *Lyng v. Northwest Indian Cemetery Protective Ass'n.*, 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988). *Lyng* provides direct and dispositive answers to the plaintiffs' First Amendment claims. The holdings of *Lyng* are the law of this country—whether or not personally acceptable to plaintiffs or those who espouse their cause.

The principal issue in *Lyng* was whether the Free Exercise Clause prevented the government from constructing a road through a portion of a National Park "that has traditionally been used for religious purposes by members of three American Indian Tribes." In concluding that the Free Exercise Clause neither restrained the government in such instance nor required it to demonstrate a compelling need to use its property for building a road in the manner contemplated, the Court held, in substance:

A court cannot weigh the adverse affects of a program on one religion and compare them with the adverse effects of some other program on a different religion;

The fact that a person's ability to practice their religion will be virtually destroyed by a governmental program does not allow them to impose a religious servitude on the property of the government [much less property which the government holds in trust for another sovereign Indian tribe];

The nature of the religious rights claimed cannot create a de facto beneficial ownership of public (or private) property, in order to practice ones religion.

However much plaintiffs, or those with similar interests may desire to permanently reside where they now do, i.e., on lands partitioned to the Hopi Tribe, that option is

not available to them.[2] To hold otherwise would afford plaintiffs rights, benefits and privileges not enjoyed by other citizens. The rights claimed by plaintiffs in Hopi lands are in total derogation of Hopi rights in and to their reservation.

The Navajo–Hopi Land Settlement Act and the many cases decided with respect to that Act are not unconstitutional. Neither the Act itself nor court cases construing the Act prohibit the free exercise of religion by any of the plaintiffs. As held in *Lyng:*

> Even if we assume that we should accept the Ninth Circuit's prediction, according to which the G–O road will 'virtually destroy the Indians' ability to practice their religion,' [*North West Indian Cemetery Protective Association v. Peterson* ] 795 F.2d [688] at 693 [ (9th Cir. 1986) ] (opinion below), the Constitution simply does not provide a principle that could justify upholding respondents' legal claims. However much we might wish that it were otherwise, government simply could not operate if it were required to satisfy every citizen's religious needs and desires. A broad range of government activities—from social welfare programs to foreign aid to conservation projects—will always be considered essential to the spiritual wellbeing of some citizens, often on the basis of sincerely held religious beliefs. Others will find the very same activities deeply offensive, and perhaps incompatible with their own search for spiritual fulfillment and with the tenets of their religion. The First Amendment must apply to all citizens alike, and it can give to none of them a veto over public programs that do not prohibit the free exercise of religion. The Constitution does not, and courts cannot, offer to reconcile the various

competing demands on government, many of them rooted in sincere religious belief, that inevitably arise in so diverse a society as ours. That task, to the extent it is feasible, is for the legislatures and other institutions.

108 S.Ct. at 1326.

As referenced in footnote 2, Congress provided in 25 U.S.C. § 640d–5(c) that:

> In any division of the surface rights to the joint use area, reasonable provision shall be made for the use of and right of access to identified religious shrines for the members of each tribe on the reservation of the other tribe when such use and access are for religious purposes.

It is significant that neither tribe has claimed that this requirement was ignored in the partition process. Following partition, each tribe filed (under seal) a designation of their religious shrines. The Court has not been requested by either tribe to enter any further order directed to this statutory provision.

Section 640d–20 addresses these same religious concerns following partition:

> Notwithstanding anything contained in this subchapter to the contrary, the Secretary shall make reasonable provision for the use of and right of access to identified religious shrines for the members of each tribe on the reservation of the other tribe where such use and access are for religious purposes.

Again, these rights may not satisfy plaintiffs—but, suffice it to say—they far exceed rights of access afforded to any other religious group in this country. These rights are enforceable; however, they do not divest the government (or a property owner) "of its right to use what is, after all, *its* land." *Lyng,* 108 S.Ct. at 1327.

---

**2.** Here there are compelling reasons to partition the land and to conclude the relocation process. Many Navajo families have relocated; range restoration and livestock reduction projects have been implemented; lands have been purchased and made a part of the Navajo Reservation to accommodate relocatees; substantial amounts have been appropriated and expended during the period 1958 to date for all of these purposes. Importantly, the completion of the relocation will encourage all interested parties

to go on with their lives and make necessary adjustments to their new environments. An important result will be that the Hopi Tribe will finally attain exclusive jurisdiction over their entire reservation, to use, manage and control, subject of course to the privileges which enure to the Navajo Tribe, and to its members, pursuant to 25 U.S.C. § 640d–20; 640d–5(c) (right of members of each tribe to use and access to identified religious shrines on the reservation of the other tribe).

### 2. There is No Violation of the American Indian Religious Freedom Act (AIRFA)

■ *Lyng* also addressed and rejected contentions similar to those asserted by plaintiffs in their second claim for relief, i.e., that their interpretation of the First Amendment was enacted into statutory law. The Court noted: "Nowhere in the law is there so much as a hint of any intent to create a cause of action or any judicially enforceable individual rights." *Id.,* at 1378.

### 3. Equal Protection Claim is Meritless

■ Plaintiffs claim that their rights have been violated because in other instances (citing the Pueblo Lands Act of 1924 and the Alaska Native Claims Settlement Act of 1971) white settlers were allowed to remain on public lands and the Indian claimants were given monetary compensation. This argument is disingenuous here where the joint property owners were two Indian Tribes.

The essential issue whether to partition the lands in kind or to give more lands to one tribe and give greater monetary compensation to the tribe receiving the unequal (lesser) land area was in the first instance, a political decision. Congress specifically directed (25 U.S.C. § 640d–5(d)):

> (d) In any partition of the surface rights to the joint use area, the lands shall, insofar as is practicable, be equal in acreage and quality: *Provided,* That if such partition results in a lesser amount of acreage, or value, or both to one tribe such differential shall be fully and finally compensable to such tribe by the other tribe. The value of the land for the purposes of this subsection shall be based on not less than its value with improvements and its grazing capacity fully restored: *Provided further,* That, in the determination of compensation for any such differential, the Federal Government shall pay any difference between the value of the particular land involved in its existing state and the value of such land in a fully restored state which results from damage to the land

which the District Court finds attributable to a failure of the Federal Government to provide protection where such protection is or was required by law or by the demands of the trust relationship.

■ The Mediator and later the District Court partitioned the lands "on the basis of fairness and equity" (25 U.S.C. § 640d–7(b)). In this process, the district court considered other alternatives, including compensation, to partition. The Ninth Circuit agreed with the district court's decision that partition was "the only practicable solution":

> We affirm the decision to partition the Joint Use Area. That resolution was recommended by the mediator, envisaged by Congress, and has long been seen as the most likely means of fully effectuating the legal rights of the Hopi and resolving this controversy.

*Sekaquaptewa v. MacDonald,* 575 F.2d 239, 245 (9th Cir.1978). This determination is res judicata and is not subject to collateral attack by the individual tribal members. *See also* 25 U.S.C. § 640d–7(a). In point of fact, this was a tribal claim that was never available to individual tribal members to assert in their own names. Plaintiffs have not been denied equal protection of the laws and their due process rights have not been violated.

### 4. Federal Trust Responsibilities Not Violated

■ Plaintiffs assert (Complaint p. 54) that the "United States and its officials, including all defendants herein, are required to protect and preserve the religious rights of plaintiffs" and that:

> 136. The proposed conduct and actions of defendants to relocate plaintiffs from their ancestral home and medicine lands will constitute a violation of this trust relationship.

This is in the main but a rescript of plaintiffs' earlier First Amendment issues. This claim serves no purpose, apart from affording plaintiffs an opportunity in their complaint to allege a number of argumentative propositions—irrelevant to the issues at hand—having to do with plaintiffs' per-

ceptions as to enactment of the Relocation Act and inferring that prior to that Act the Hopis and Navajos co-existed peacefully on what had been the joint use area. (Complaint, pp. 44–47). Without extending this discussion, a reading of *Healing v. Jones*, 174 F.Supp. 211 (D.Ariz.1959), and *Healing v. Jones*, 210 F.Supp. 125 (D.Ariz.1962), *aff'd*, 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963), will be instructive to those interested in how these inter-tribal problems developed post–1882. As noted in *Hamilton v. MacDonald*, 503 F.2d 1138, 1146 (9th Cir.1974), problems between the tribes continued unabated after *Healing*, culminating in Congress authorizing partition of the joint use areas by the 1974 legislation: [3]

> The district court determined that the Hopi had been ousted, and that finding is not clearly erroneous—indeed, it is more than amply supported by the evidence. A careful review of the record reveals that the Hopi Tribe made demands for use of its joint interest to both the government and the Navajo Tribe, but that it has been excluded wrongfully from any but an insubstantial use of the joint use area by the acts of members and officials of appellant [Navajo] Tribe and of government officials.

The Government has a trust obligation to both tribes. It failed to fairly act to protect the Hopi rights for many, many years. Congress and the Courts—at Congress' direction—were ultimately required to resolve the disputes between these two tribes.

The Navajo–Hopi Land Settlement Act was enacted after extended Congressional hearings and has been amended to address particular programs or concerns of the involved tribes. Many members of the Navajo Tribe have relocated from the Hopi lands after partition pursuant to the Act, as have most of the relatively few Hopi families living on the lands partitioned for exclusive use of the Navajo Tribe. Programs are in place to provide counselling to persons who must relocate and to advise those persons about their rights as relocatees. These assistance and advisory programs do not violate the constitutional rights of the relocatees. On some occasions, an employee of a government agency may have done something that offended one of the relocatees or members of their family, either with respect to the time or place of the meeting, or information concerning relocation procedures. There is nothing to suggest that these discussions were coercive in character or purpose, or that they require supervision by the Court. Relocation, with one exception[4]—under the Navajo–Hopi Land Settlement Act is not now, and it has never been—a voluntary undertaking by members of the Hopi Tribe residing on lands partitioned to the Navajo tribe, or by members of the Navajo Tribe residing on lands partitioned to the Hopi Tribe. In the event a person (family) subject to relocation does not participate in and complete relocation, he or she is subject to relocation (eviction) when a "new or replacement home" is provided for their household. See 99 Stat. 1257; 100 Stat. 1783–278.

### 5. *International Law and United Nations Charter claims are legally frivolous*

Claims Fifth, Sixth and Seventh are, to adopt a phrase used by another court, "far

---

**3.** See also: *Hamilton v. Nakai*, 453 F.2d 152 (9th Cir.1971), *cert. denied*, 406 U.S. 945, 92 S.Ct. 2044, 32 L.Ed.2d 332 (1972); *United States v. Kabinto*, 456 F.2d 1087 (9th Cir.1972); *Sekaquaptewa v. MacDonald*, 544 F.2d 396 (9th Cir. 1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1550, 51 L.Ed.2d 774 (1977); *Sekaquaptewa v. MacDonald*, 575 F.2d 239 (9th Cir.1978); *Sekaquaptewa v. MacDonald*, 626 F.2d 113 (9th Cir.1980); *Sidney v. MacDonald*, 536 F.Supp. 420 (D.Ariz. 1982), *aff'd*, *Sidney v. Zah*, 718 F.2d 1453 (9th Cir.1983); *Hopi Tribe v. Watt*, 530 F.Supp. 1217 (D.Ariz.1982), *aff'd* 719 F.2d 314 (9th Cir.1983). See also *Sekaquaptewa v. MacDonald*, 448 F.Supp. 1183 (D.Ariz.1978); *Sekaquaptewa v. MacDonald*, 619 F.2d 801 (9th Cir.1980); and *Sekaquaptewa v. MacDonald*, 591 F.2d 1289 (9th Cir.1979) for cases involving the dispute between the tribes over lands on an adjoining Reservation.

**4.** The Relocation Act (25 U.S.C. § 640d–28) provides that eligible persons may apply for life estate leases, allowing them to remain on the reservation of the other tribe until one of two determinable events occur.

fetched." [5]

■ International law in general is relevant only where there is no treaty and no controlling executive or legislative act or judicial decision. *Garcia–Mir v. Meese,* 788 F.2d 1446 (11th Cir.1986), *cert. denied, Ferrer–Mazorra v. Meese,* 479 U.S. 889, 107 S.Ct. 289, 93 L.Ed.2d 263 (1986).

■ The United Nations Charter is not a "self-executing international obligation of the United States." *Spiess v. Itoh & Co. (America), Inc.,* 643 F.2d 353, 363 (5th Cir.1981); Restatement of the Law (Third), The Foreign Relations Law of The United States, § 701, p. 156. The Navajo–Hopi Land Settlement Act was enacted in the interest of this nation. It is not overridden by the United Nations Charter.

■ More directly, the Navajo–Hopi Settlement Act and programs implementing that Act do not violate plaintiffs' rights under customary international law or the United Nations Charter. Recognizing the difficult problems to be resolved between the interests of the two tribes to lands that each had the right to co-equal use prior to partition, Congress acted to protect the interests of both tribes. Relocation benefits, if not acceptable to these plaintiffs, would be the envy of countless millions in other countries. The Court's remarks in *Hamilton,* 503 F.2d at 1145, are as true today as they were when written in 1974:

> This is poor men against other poor men, fighting against a long historical backdrop for an over-grazed, harsh, and inhospitable area which yields little above a subsistence living. Both tribes have historical claims to the area, and both undoubtedly have present economic need. Any solution is inevitably bound to cause suffering. The Order of Compliance and implementation plans attempt to minimize the economic dislocation caused the Navajo sheepherders, but the district court obviously cannot at the same time implement the decree protecting Hopi interests and not visit hardships on the Navajo, who presently use the entire area. Were the issues res nova, we

could not say that the equal division struck was an abuse of discretion.

■ The United States Senate ratified the Genocide Convention in 1987, with three understandings and one declaration. The "Genocide Convention Implementation Act of 1987 (The Proxmire Act)" appears in the Criminal Code as 18 U.S.C. § 1091, *et seq.* Only the most partisan of advocates would argue that the Navajo–Hopi Land Settlement Act or subsequent amendments violate in word or spirit the Genocide Implementation Act of 1987:

> (a) Basic offense.—Whoever, whether in time of peace or in time of war, in a circumstance described in subsection (d) and with the specific intent to destroy, in whole or in substantial part, a national, ethnic, racial, or religious group as such—
>
> (1) kills members of that group;
>
> (2) causes serious bodily injury to members of that group;
>
> (3) causes the permanent impairment of the mental faculties of members of the group through drugs, torture or similar techniques;
>
> (4) subjects the group to conditions of life that are intended to cause the physical destruction of the group in whole or in part;
>
> (5) imposes measures intended to prevent births within the group; or
>
> (6) transfers by force children of the group to another group; or attempts do so, shall be punished as provided in subsection (b).

If the Act was otherwise applicable—*which it is not*—section 1092 provides that nothing in the Act should "be construed as creating any substantive or procedural right enforceable by law by any party in any proceeding."

## CONCLUSION

The Court finds that plaintiffs have failed to establish either the likelihood of eventual success on the merits as to any of their claims, or that serious questions are raised and the balance of hardships tips sharply in their favor. See *Johnson Con-*

---

**5.** *United States of America v. Komisaruk,* 885 F.2d 490 (9th Cir.1989).

*trols, Inc. v. Phoenix Control Systems, Inc.*, 886 F.2d 1173, 1174 (9th Cir.1989). In this instance, the public interest would not be advanced by granting of what would be an improvident preliminary injunction.

ACCORDINGLY,

IT IS ORDERED denying plaintiffs' Motion for Preliminary Injunction.

IT IS FURTHER ORDERED granting defendants' Motion to Dismiss.

IT IS FURTHER ORDERED that Judgment be entered that plaintiffs take nothing by reason of their complaint.