AMERICAN GREYHOUND RACING, INC., a Delaware corporation; Western Racing, Inc., a Delaware corporation; TP Racing LLLP, an Arizona limited liability partnership, Plaintiffs–Appellees,

v.

Jane Dee HULL, Governor of Arizona; State of Arizona; Janet Napolitano, Attorney General of the State of Arizona; State of Arizona, Defendants–Appellants,

and

Richard Romley, County Attorney of Maricopa County, Arizona, Defendant,

v.

Tucson Greyhound Park, Inc., Plaintiff–Intervenor–Appellee.

American Greyhound Racing, Inc., a Delaware corporation; Western Racing, Inc., a Delaware corporation; TP Racing LLLP, an Arizona limited liability partnership, Plaintiffs–Appellants,

v.

Jane Dee Hull, Governor of Arizona; State of Arizona; Janet Napolitano, Attorney General of the State of Arizona; Richard Romley, County Attorney of Maricopa County, Arizona; State of Arizona, Defendants–Appellees,

v.

Tucson Greyhound Park, Inc., Plaintiff–Intervenor.

**58.** *See Allis–Chalmers*, 471 U.S. at 213–14, 105 S.Ct. 1904.

American Greyhound Racing, Inc., a Delaware corporation; Western Racing, Inc., a Delaware corporation; TP Racing LLLP, an Arizona limited liability partnership, Plaintiffs,

v.

Jane Dee Hull, Governor of Arizona; State of Arizona; Janet Napolitano, Attorney General of the State of Arizona; State of Arizona, Defendants–Appellees,

and

Richard Romley, County Attorney of Maricopa County, Arizona, Defendant,

v.

Tucson Greyhound Park, Inc., Plaintiff–Intervenor–Appellant.

Nos. 01–16672, 01–17319 and 01–17321.

United States Court of Appeals, Ninth Circuit.

Argued and Submission Deferred July 8, 2002.

Submitted July 25, 2002.

Filed Sept. 19, 2002.

Scott Bales, Lewis and Roca LLP, Phoenix, AZ, for the defendants-appellants-appellees.

Neil Vincent Wake, Linda D. Skon, Law Offices of Neil Vincent Wake, Phoenix, AZ, for the plaintiffs-appellees-appellants.

Donald M. Peters, Miller LaSota & Peters, PLC, Phoenix, AZ, for plaintiff-intervenor-appellee-appellant.

Thomas L. Hudson, Osborn, Maledon, P.A., Phoenix, AZ; Eric N. Dahlstrom, Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Frye, LLP, Phoenix, AZ; Daniel J. Quigley, Quigley & Whitehill, P.L.C., Tucson, AZ; Frank R. Jozwiak, Morisset, Schlosser, Ayer & Jozwiak, Seattle, WA, for the amici curiae.

Before: CANBY and RYMER, Circuit Judges, and BERTELSMAN,* Senior District Judge.

Opinion by Judge CANBY; Dissent by Judge RYMER.

CANBY, Circuit Judge.

Racetrack owners and operators brought this action against the Governor of Arizona [1] to challenge the legality of the Governor's actions in negotiating new gaming compacts with Indian tribes, or in extending the tribes' existing compacts. The district court denied the Governor's motion to dismiss on the ground that the compacting tribes were indispensable parties. The court then granted the plaintiffs relief principally on two grounds: (1) the state statute authorizing the Governor to negotiate compacts, A.R.S. § 5–601, was an unlawful delegation of legislative power without sufficient standards for its exercise; and (2) in any event, A.R.S. § 5–601 did not authorize the Governor to negotiate compacts for most casino-type games because such games were prohibited by state law. *Am. Greyhound Racing, Inc. v. Hull,* 146 F.Supp.2d 1012 (D.Ariz.2001). The district court accordingly enjoined the Governor from executing new compacts pursuant to A.R.S. § 5–601 and ordered her to give notice of non-renewal of existing compacts entered pursuant to that statute. It further enjoined the Governor against modifying such existing contracts to increase the amount or kind of gaming permitted by the compacts.

We vacate the district court's judgment and remand with instructions to dismiss the action because we conclude that the compacting tribes were indispensable parties with sovereign immunity from suit.

### Background

Because the question whether a party is indispensable "can only be determined in the context of particular litigation," *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 118, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968), it is necessary to set forth in some detail the legal and factual context of the present controversy.

*The Indian Gaming Regulatory Act ("IGRA")*

Congress enacted the Indian Gaming Regulatory Act ("IGRA") in 1988, following the Supreme Court's decision of *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). Congress declared that IGRA's primary purpose was "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." [2]

---

* The Honorable William O. Bertelsman, Senior United States District Judge for the Eastern District of Eastern Kentucky, sitting by designation.

1. The State of Arizona and certain other state or local officers were also named as defendants. For purposes of this opinion, officers other than the Governor are considered to be nominal defendants; the State of Arizona has been dismissed by agreement of the parties in the district court.

2. Congress declared its three purposes in a declaration of policy at 25 U.S.C. § 2702:

 (1) to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;

IGRA establishes three classes of gaming. Class I includes social games for prizes of minimal value and traditional forms of Indian gaming. 25 U.S.C. § 2703(6). Class II includes bingo, similar games, and certain card games. *Id.* at § 2703(7)(A). Class III comprises all games not in classes I or II. *Id.* at § 2703(8). Slot machines, keno, and blackjack are Class III games. *See id.* § 2703(7)(B).

A tribe may engage in Class III gaming only if: (1) the tribe has authorized the Class III gaming by a tribal ordinance or resolution; (2) the Class III gaming will be "located in a State that permits such gaming for any purpose by any person, organization, or entity"; and (3) the Class III gaming is conducted in conformity with a tribal-state compact that is in effect. *See* 25 U.S.C. § 2710(d)(1).

*Indian Gaming in Arizona*

Indian gaming in Arizona is now well-established, but it had rocky beginnings that were well described in detail by the district court. *See Am. Greyhound,* 146 F.Supp.2d at 1054–59. It is sufficient to note here that, shortly after IGRA was enacted, the Yavapai–Prescott Indian Tribe, after unsuccessful negotiations, sued the State to require it to enter a compact. *See Yavapai–Prescott Indian Tribe v. Arizona,* 796 F.Supp. 1292 (D.Ariz.1992). Several other tribes intervened. Then, in 1992, the state legislature passed and Governor Symington signed A.R.S. § 5–601. That statute provided, among other things:

> A. Notwithstanding any other law, this state, through the governor, may enter into negotiations and execute tribal-state compacts with Indian tribes in this state pursuant to the Indian gaming regulatory act of 1988. . . .

A.R.S. § 5–601(A).[3]

Under the authorization of this statute, Governor Symington entered pacts with the Yavapai–Prescott and three other tribes. Three tribes remaining in the Yavapai–Prescott litigation went to mediation and the mediator approved the tribes' proposal. After a period of resistance,[4] Governor Symington entered compacts with the three tribes in 1993, and shortly thereafter entered compacts with several more tribes. By 1994, Governor Symington had entered compacts with sixteen tribes pursuant to A.R.S. § 5–601. The later compacts were for initial terms of ten years.

---

(2) to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and

(3) to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.

3. Section 5–601 was reenacted in 2000 with amendments providing that compacts must include provisions prohibiting gambling by persons under 21 years of age, § 5–501(B), as well as provisions containing guidelines for use of credit cards or automatic tellers, requiring posting of notices for persons having problems with gambling, prohibiting gaming advertising directed to minors, establishing guidelines for treatment and prevention of problem gambling, and establishing guideline procedures for voluntary banning of gamblers from gaming facilities, § 5–601(h). *See* 2000 Ariz. Sess. Laws ch. 14, § 4, ch. 305, § 1.

4. Governor Symington's resistance included stimulating the enactment of a statute criminalizing all casino-type gaming in Arizona. 1993 Ariz. Sess. Laws 1st Spec. Sess., ch. 1. The statute was repealed a year later. 1994 Ariz. Sess. Laws, ch. 285, § 1.

After sixteen compacts were executed, this court decided *Rumsey Indian Rancheria of Wintun Indians v. Wilson,* 41 F.3d 421, 427 (9th Cir.1994), *as amended,* 99 F.3d 321 (9th 14476 Cir.1996), which held that states were not required to negotiate for particular types of Class III games that were not otherwise permitted under state law. In light of *Rumsey,* Governor Symington refused to execute a compact with the Salt River Pima–Maricopa Indian Community on the ground that, although Arizona permitted some Class III gaming, it did not permit the slot machines and other casino-type gaming sought by the Salt River Community. The Salt River Community responded with a successful initiative campaign that resulted in A.R.S. § 5–601.01, which provided:

A. Notwithstanding any other law or the provisions of § 5–601, the state, through the governor, shall enter into the state's standard form of gaming compact with any eligible Indian tribe that requests it.

B. For purposes of this section:

1. The state's standard form of gaming compact is the form of compact that contains provisions ... that are common to the compacts entered into by this state with Indian tribes in this state on June 24, 1993.

. . .

2. An eligible Indian tribe is an Indian tribe that has not entered into a gaming compact with the state.

Pursuant to this statute, the Salt River Community tendered a proposed standard compact, but Governor Symington attempted to add a clause requiring the location of casinos on the reservation to be approved by the State. The Salt River Community sued, and prevailed in the Arizona Supreme Court, which required the governor to enter the tendered compact. *Salt River Pima–Maricopa Indian Cmty.*

*v. Hull,* 190 Ariz. 97, 945 P.2d 818 (1997). Subsequently, individual plaintiffs sued to prevent the governor from entering the compact on the ground that casino-type gaming was prohibited by Arizona law; the plaintiffs prevailed in trial court but the decision was set aside for lack of standing by the Arizona Supreme Court. *Sears v. Hull,* 192 Ariz. 65, 961 P.2d 1013 (1998). The Court recognized that it had discretion under state law to waive the requirement of standing in cases "of great public importance that are likely to recur," but declined to do so in part because "the Sears' opposition to gaming and their interpretation of the statutes involved[ ] are not of such great moment or public importance as to convince us to consider this challenge to executive conduct." *Id.* at 1019–20.

*The Present Litigation*

The ten-year terms of several of the early compacts end in 2003. The compacts provide, however, that the terms shall be automatically extended for additional, successive terms of five years unless either party serves a notice of nonrenewal 180 days before expiration of the original or any extended term. Governor Hull, who succeeded Governor Symington, indicated an interest in negotiating modified compacts to take effect when the original ten-year terms expired, and negotiations were undertaken toward that goal.

The plaintiffs, horse and dog track owners and operators, then filed this action in state court, seeking to prevent the Governor from negotiating new compacts permitting casino-type gaming or from permitting the existing compacts to be automatically renewed. The defendants, the Governor and other state or county officials, removed the case to federal court. In their amended complaint filed in district court, the plaintiffs alleged that

the Governor threatened to enter new or extended contracts that allow slot machines, keno, and blackjack gaming. The plaintiffs alleged eight principal claims: (1) it exceeds the Governor's authority under § 5–601 to enter or extend contracts authorizing gaming not otherwise permitted in Arizona; (2) § 5–601 violates the state constitutional separation of powers by delegating legislative authority to the Governor to authorize gaming otherwise prohibited; (3) the new or extended contracts violate IGRA because IGRA prohibits gaming not authorized by state law; (4) § 5–601 violates the state constitutional guarantee of equal privileges, Ariz. Const. art. II, § 13 by authorizing tribes to conduct gaming prohibited to others; (5) § 5–601 violates the state constitutional provision against local or special laws, Ariz. Const. art. IV, pt. 2, § 19, by granting special privileges to Indian tribes; (6) § 5–601 violates the federal equal protection clause by distributing gaming privileges according to race; (7) compacts are treaties that states are prohibited from entering by the federal Constitution, U.S. Const. art. I, § 10; and (8) § 5–601 violates the state constitution by authorizing legislation that is contingent upon tribal consent.

The district court, in a meticulous and exhaustive opinion, made several critical rulings. It held that the plaintiffs had standing to challenge proposed or extended contracts, and that the controversy was ripe and justiciable. *Am. Greyhound*, 146 F.Supp.2d at 1031–42. The court held that tribes presently operating under compacts were neither necessary nor indispensable parties. *Id.* at 1042–1051. It further held that IGRA did not preempt the plaintiffs' state-law claims. *Id.* at 1051–53. With regard to the plaintiffs' claims based directly on IGRA, however, the district court held that IGRA provided no private right of action; it therefore dismissed those claims. *Id.* at 1053–54.

In addressing the crux of the plaintiffs' claims, the district court held that: (1) casino-type gaming is not permitted under Arizona law, *id.* at 1060–66; (2) § 5–601 authorizes the Governor to enter compacts for types of gaming otherwise prohibited by Arizona law, *id.* at 1066–67; (3) IGRA authorizes states to enter compacts to permit only those types of gaming that are otherwise lawful under state law, *id.* at 1067–69; and (4) § 5–601 violates the state separation of powers by granting unrestricted legislative authority to the Governor, *id.* at 1069–72. Recognizing that these rulings were sufficient to grant relief to the plaintiffs, the district court nevertheless ruled as follows on the remaining claims in the interest of economy and completeness: (5) gaming compacts are not "local or special" laws prohibited by the Arizona Constitution, Ariz. Const. art. IV, pt. 2, § 19(13), *id.* at 1072–74; (6) tribal compacts granting exclusive rights to tribes to conduct casino gaming do not violate the equal protection clause of the U.S. Constitution, *id.* at 1073–78; (7) tribal gaming compacts do not violate the equal privileges clause of the Arizona Constitution, Ariz. Const. art. II, § 13, *id.* at 1079; (8) gaming compacts are not treaties forbidden to the states by the federal Constitution, U.S. Const. art. 1, § 10, *id.* at 1080; and (9) compacts are not state law for purposes of Article III of the Arizona Constitution, and thus may be contingent upon tribal approval, *id.* at 1080–81.

The district court then enjoined the Governor from:

A. Entering into, modifying, or renewing, by action or inaction, any gaming compacts with any tribe or any compacts to the extent they purport to allow slot machine, keno or blackjack gaming, and/or

B. Causing, allowing or implementing, by action or inaction, any expansion or increase in the kind, nature, quantity or duration of class III gaming by any tribe in connection with any gaming compact entered pursuant to A.R.S. § 5–601(A), including by changes in the compacts.

The injunction further required the Governor:

to give notice of nonrenewal on or before June 1, 2002, of each and every gaming compact made either by her or her predecessors pursuant to A.R.S. § 5–601(A). Such notice shall be given in the manner stated in each gaming compact.

The district court also stated in a companion order that A.R.S. § 6–501.01, which required the Governor upon request to sign new "standard" gaming compacts for tribes without compacts, was not before the court, and the injunctive relief did not speak to the Governor's authority under that statute.

The Governor appealed the district court's judgment. The plaintiffs cross-appealed the dismissal with prejudice of its alternative claims based on the federal equal protection clause, the state equal privileges clause, and the state clause prohibiting local or special laws.

### Discussion

The issue that we find dispositive of this appeal, and indeed this litigation, is whether the Arizona tribes with gaming compacts entered pursuant to A.R.S. § 5–601(A) are indispensable parties. We conclude that they are, and that the case must be dismissed because the tribes enjoy sovereign immunity from suit and have not consented to be sued.

The framework for determining whether a party is necessary and indispensable is provided by Fed.R.Civ.P. 19(a). As the district court recognized, the proper approach is first to decide whether the tribes are, in the traditional terminology, "necessary" parties who should normally be joined under the standards of Rule 19(a). If the tribes are necessary parties, the district court must then determine whether the tribes are "indispensable"; that is, "whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed." Fed.R.Civ.P. 19(b); *see Clinton v. Babbitt,* 180 F.3d 1081, 1088 (9th Cir.1999). We review these determinations of the district court for an abuse of discretion, but if the district court's determination that the tribes' interests would not be impaired decided a question of law, we review that determination de novo. *See Kescoli v. Babbitt,* 101 F.3d 1304, 1309 (9th Cir.1996).

### The Tribes as Necessary Parties

Rule 19(a) provides for joinder of a party (again, in the traditional terminology, as "necessary") if *any* of the following requisites is met:

(1) in the person's absence complete relief cannot be accorded among those already parties, or

(2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may

(i) as a practical matter impair or impede the person's ability to protect that interest or

(ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed.R.Civ.P. 19(a).

The district court found that none of these requirements was met, and that the tribes accordingly were not necessary par-

ties. We need not address all the elements ruled upon by the district court because we conclude that the compacting tribes met the requirement of subsection (a)(2)(i): the tribes claim an interest and are so situated that this litigation *as a practical matter* impairs or impedes their ability to protect it. It was an abuse of discretion for the district court to find otherwise.

The compacts provide for automatic renewal if neither party gives the requisite notice of termination. This provision is an integral part of the existing compacts, and was part of the bargain that the tribes entered with the State. Prior to this litigation, the tribes enjoyed compacts that would endure indefinitely so long as the Governor was willing. Although the Governor had indicated a desire to negotiate modified compacts to take effect when the original ten-year compact terms expired, it is by no means probable that the Governor, if unable to negotiate different agreements, would have elected to terminate the present ones and shut down virtually the entire Indian gaming industry in Arizona. Yet the district court's injunction requires her to do just that; it directs the Governor to give notice of termination of all the compacts entered pursuant to A.R.S. § 5–601(A). Before this litigation, the tribes had a right to renewal if a Governor was willing to leave the compacts in effect; after the litigation, termination was the only option. Would the tribes have made the same bargain if the compacts had provided for automatic termination at the end of their original ten-year terms? We cannot say, but there can be no question that automatic termination renders the compacts less valuable to the tribes. *See Kescoli*, 101 F.3d at 1309–10 (invalidation of one condition in lease of absent party af-

fects operations of entire lease). The interests of the tribes in their compacts are impaired and, not being parties, the tribes cannot defend those interests.

 The district court rejected this analysis on the ground that a right to renewal that is voluntary on both sides does not create a property right in the contracting party. *Am. Greyhound*, 146 F.Supp.2d at 1046. But Rule 19(a)(2) does not require a property right; it requires an "interest" that will be impaired by the litigation "as a practical matter." Fed. R.Civ.P. 19(a)(2)(i). We have held that the interest must be a "legally protected" one, *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir.1990), but we have not required that the interest be property in the sense of the due process clause. We addressed this point in *Clinton v. Babbitt*, 180 F.3d at 1088–89, when we held that the Hopi Tribe was a necessary party to an action seeking to prevent the Secretary of the Interior from approving certain land leases. We stated:

> None of the leases has been approved as yet. Therefore, according to the plaintiffs, the Tribe lacks a vested interest in the leases and lacking such an interest it has no legally protected interest that may be impaired or impeded by the present action. This argument misapprehends what is required to establish necessary party status under subparagraph (2) of Rule 19(a).

*Id.* at 1088; *see also Srader v. Verant*, 125 N.M. 521, 964 P.2d 82, 90 (1998) (tribes indispensable parties even in absence of showing that they were actual owners or operators of affected tribal casinos). Here, the interest of the tribes arises from terms in bargained contracts, and the interest is substantial.[5]

---

5. The district court correctly ruled that the Governor could not adequately represent the

interests of the absent tribes. As the district court pointed out, *the State and the tribes*

■ The district court also opined that the tribes could have no legally protected interest in gaming that was not permitted by state law. But it was the district court's decision in this case that determined that casino-type gaming was not permitted by state law, and the tribes were entitled to be heard on that issue. We have rejected this kind of circularity in determining whether a party is necessary. *See Shermoen v. United States,* 982 F.2d 1312, 1317 (9th Cir.1992). It is the party's *claim* of a protectible interest that makes its presence necessary. *See id.*

The district court's ruling that state law prohibits casino-type gaming, and its consequent ruling that such gaming by Indian tribes violates IGRA, present another problem. Although the district court enjoined only the execution of future compacts or the extension of existing ones, its order amounts to a declaratory judgment that the present gaming conducted by the tribes is unlawful. It is true that the tribes are not bound by this ruling under principles of res judicata or collateral estoppel because they are not parties, but their interests may well be affected *as a practical matter* by the judgment that its operations are illegal. *See Confederated Tribes of the Chehalis Reservation v. Lujan,* 928 F.2d 1496, 1499 (9th Cir.1991) (amended opinion) (judgment against Secretary precluding continued recognition of non-party tribe would alter tribe's authority to govern reservation). The sovereign power of the tribes to negotiate compacts is impaired by the ruling. *See Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.,* 276 F.3d 1150, 1157 (9th Cir.2002). Moreover, enforcement au-

thorities may consider themselves compelled to act against the tribes. That the tribes could litigate the issue of legality free of the constraints of res judicata or collateral estoppel does not by itself excuse their absence as necessary parties. Otherwise Rule 19(a) would become a nullity: a person's interests could never be impaired or impeded in the absence of joinder. *See Provident Tradesmens,* 390 U.S. at 110, 88 S.Ct. 733.

We conclude, therefore, that the district court abused its discretion in ruling that the tribes with existing compacts entered pursuant to A.R.S. § 5–601(A) were not necessary to this litigation.

*The Tribes as Indispensable Parties*

■ We proceed, then, to the consideration of indispensability under Rule 19(b): "whether in equity and good conscience the action should proceed among the parties before[the court], or should be dismissed." *Id.* The factors to be considered are:

first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties;

second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided;

third, whether a judgment rendered in the person's absence will be adequate; [and]

fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Fed.R.Civ.P. 19(b).

Not surprisingly, the first factor of prejudice, insofar as it focuses on the absent

---

have often been adversaries in disputes over gaming, and the State owes no trust duty to the tribes. *Am. Greyhound,* 146 F.Supp.2d at 1050. Moreover, the Governor's and the tribes' interests under the compacts are potentially adverse. Even the United States,

which does have a trust responsibility, is not an adequate representative of Indian tribes if the litigation presents it with conflicts of interest. *See Shermoen,* 982 F.2d at 1318; *Manybeads v. United States,* 209 F.3d 1164, 1166 (9th Cir.2000).

party, largely duplicates the consideration that made a party necessary under Rule 19(a): a protectible interest that will be impaired or impeded by the party's absence. *See, e.g., Chehalis,* 928 F.2d at 1499; *Dawavendewa,* 276 F.3d at 1162. At a minimum, the tribes will be prejudiced by the required termination of their compacts that, in the absence of action by the Governor, would automatically renew. The amount of prejudice to the tribes from termination of existing compacts and inability to enter new ones would be enormous.

With regard to the shaping of relief, it might seem superficially plausible to eliminate that portion of the district court's injunction that precludes modification or extension of existing compacts, but that remedy would be too drastic and yet insufficient at the same time. The principal plaintiffs devoted a section of their appellate brief to the proposition that the compelled termination of the existing compacts was an essential remedy, and that "notice of non-renewal is necessary to prevent automatic renewal and frustration of the relief to which the Racetracks are entitled." Termination of existing compacts is central to this litigation, as the parties apparently recognized from the outset; the district court stated that "[w]ith regard to the second factor, the parties have not suggested any specific ameliorative measures." *Am. Greyhound,* 146 F.Supp.2d at 1049. At the same time, elimination of the clauses enjoining the Governor from terminating or modifying existing compacts would not protect the tribes from other potential effects of the declaration that the gaming conducted by the tribes pursuant to their compacts is illegal.

The third factor does not favor the plaintiffs. If they retain the judgment as it was entered by the district court, they have achieved what they sought but the tribes' protectible interests are impaired. *See Dawavendewa,* 276 F.3d at 1162. If the non-renewal clause is removed from the injunction, the relief is not adequate, as we have just pointed out in our discussion of the second factor.

The fourth factor would ordinarily favor the plaintiffs; there is no adequate remedy available to them if this case is dismissed for lack of joinder of indispensable parties. But this result is a common consequence of sovereign immunity, and the tribes' interest in maintaining their sovereign immunity outweighs the plaintiffs' interest in litigating their claims. *See Pit River Home & Agric. Coop. Ass'n v. United States,* 30 F.3d 1088, 1102–03 (9th Cir.1994); *Clinton,* 180 F.3d at 1090. Indeed, some courts have held that sovereign immunity forecloses in favor of tribes the entire balancing process under Rule 19(b), but we have continued to follow the four-factor process even with immune tribes. *See Chehalis,* 928 F.2d at 1499. With regard to the fourth factor, however, we have regularly held that the tribal interest in immunity overcomes the lack of an alternative remedy or forum for the plaintiffs. *See, e.g., Dawavendewa,* 276 F.3d at 1162. We conclude, therefore, that "in equity and good conscience" this action cannot proceed. Fed.R.Civ.P. 19(b).

*The Public Rights Exception*

We reject the plaintiffs' contention that this case falls within the "public rights" exception to the requirement of joinder of otherwise indispensable parties. The plaintiffs rely on *Conner v. Burford,* 848 F.2d 1441 (9th Cir.1988), in which we held that environmental groups could challenge the manner in which environmental statutes had been applied to oil and gas leases without joining some of the lessees. We stated that "[t]he appellees' litigation against the government does not purport to adjudicate the rights of current lessees;

it merely seeks to enforce the public right to administrative compliance with the environmental protection standards of NEPA and the ESA." *Id.* at 1460; *see also Makah*, 910 F.2d at 559 & n. 6. The plaintiffs contend that their action seeks only to ensure that the Governor acts in accordance with the state constitution and laws.

Almost any litigation, however, can be characterized as an attempt to make one party or another act in accordance with the law. To qualify for the public rights exception, "the litigation must transcend the private interests of the litigants and seek to vindicate a public right." *Kescoli*, 101 F.3d at 1311. In *Kescoli*, we refused to apply the public rights exception to the claim of a plaintiff to enforce the Surface Mining Control and Reclamation Act to prevent encroachment on burial sites. *Id.* We agreed with the district court that the plaintiff's claim was "a private one focused on the merits of her dispute rather than on vindicating a larger public interest." *Id.* (quoting the district court). The same may be said of the plaintiffs in the present case; their interest is in freeing themselves from the competition of Indian gaming, not in establishing for all the principle of separation of powers. Moreover, their litigation targeted the extension or renegotiation of the compacts themselves, which was not the case with the leases in *Conner*. *See Conner*, 848 F.2d at 1461.

It is important in this case to retain perspective. This litigation does not *incidentally* affect the gaming tribes in the course of enforcing some public right. This litigation is *aimed* at the tribes and their gaming. It was central to the plaintiffs' case to establish that casino-type gaming of the kind carried on under the existing compacts was unlawful under state law and IGRA. This case is thus distinguishable from *Makah Indian Tribe*,

in which we held that other tribes were not necessary parties to that part of the Makah's action that sought to require administrative authorities to follow certain procedures in establishing future fishing quotas for all parties, including the Makah. *Makah Indian Tribe*, 910 F.2d at 559. We deemed all tribes equally interested in lawful administrative procedures. *Id.* We also held, however, that affected tribes were necessary and indispensable to adjudication of Makah claims that had a direct impact on the fish that could be taken by those tribes. In the present case, the effect of the district court's injunction is not merely to require adherence to certain procedures in entering or extending gaming compacts with the tribes; it is to prevent new compacts or the extension of existing ones. The plaintiffs sought this injunction to avoid competitive harm to their own operations. The general subject of gaming may be of great public interest, but the rights in issue between the plaintiffs in this case, the tribes and the state are more private than public.

We draw support for our conclusion from the opinion of the Supreme Court of Arizona in *Sears v. Hull*, 192 Ariz. 65, 961 P.2d 1013 (1998), which addressed an analogous issue. In that case, plaintiffs who challenged the legality of a new "standard" compact to be entered pursuant to A.R.S. § 5–601.1 were held to lack standing. They argued that their challenge, which was based on the state constitution, state statutes and IGRA, qualified for an exception to the standing requirement for cases "involving issues of great public importance that are likely to recur." *Id.* at 1019. The Court refused to invoke the exception, noting that it had considered some of the plaintiffs' contentions in *Salt River Pima–Maricopa Indian Community*, and that "[t]he remaining issues, which essentially reflect the Sears' opposition to

gaming and their interpretation of the statutes involved, are not of such great moment or public importance as to convince us to consider this challenge to executive conduct." *Id.*

The plaintiffs here rely, as did the plaintiffs in *Sears,* on the decision of the Supreme Court of New Mexico in *New Mexico ex rel. Clark v. Johnson,* 120 N.M. 562, 904 P.2d 11 (1995). That decision held that tribes were not indispensable to a case holding the state governor to have been without power to enter executed gaming compacts. We do not find the *Clark* decision to be as persuasive as the decisions upon which we have relied. In any event, the Supreme Courts of Arizona and New Mexico have clearly pointed out the limits of the *Clark* ruling. The Supreme Court of Arizona in *Sears* differentiated *Clark* as follows:

> In contrast to Arizona, ... neither the legislature nor the citizens of New Mexico had expressly delegated to the governor authority to enter tribal gaming compacts on the state's behalf. The petitioners' claims therefore presented "issues of constitutional and fundamental importance" with respect to separation of powers required by the state constitution. Because Arizona expressly authorized the Governor to execute the standard gaming compacts, the serious constitutional issues that gave rise to the *[Clark]* court's decision to confer standing do not exist here.

*Sears,* 961 P.2d at 1020 (citations and footnotes omitted). The Supreme Court of New Mexico subsequently held the tribes to be indispensable parties to litigation brought by state legislators and others to challenge the legality of legislation authorizing Indian gaming in New Mexico. *New Mexico ex rel. Coll v. Johnson,* 128 N.M. 154, 990 P.2d 1277 (1999). The Court distinguished *Clark* in the same manner as the Supreme Court of Arizona did; indeed, its opinion cited *Sears.* *Id.,* at 1281.

We conclude, therefore, that the plaintiffs' present challenge to the legality of new or extended gaming compacts does not fall within the public rights exception to the rule of indispensability.

### Conclusion

The tribes with gaming compacts issued pursuant to A.R.S. § 6–501(A) are necessary and indispensable parties to this litigation. The district court abused its discretion in ruling to the contrary. Those tribes are immune from suit, *see Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc.,* 523 U.S. 751, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998), and they have not consented to be sued. We therefore vacate the decision of the district court and remand this matter with instructions to dismiss the action for failure to join indispensable parties. Because the action must be dismissed on this threshold ground, we do not address the other contentions raised by the parties.[6]

**VACATED; REMANDED with instructions.**

RYMER, Circuit Judge, dissenting.

I agree with the majority that the tribes have a keen interest in gaming compacts, and that their interest in future compacts could be affected as a practical matter by the outcome of this litigation. However, the relief sought in this case does not affect existing compacts; it concerns only the Governor's authority under state law to enter into gaming compacts prospectively. And, while unquestionably substantial and important, the tribes' interest is not a *legally protected* interest that may not be

---

6. The motion by state appellants to strike or, in the alternative to respond to, portions of the plaintiffs' response to amicus briefs, is denied.

resolved in their absence. This is because the existing compacts do not have an automatic term of renewal. If they did, the majority's reasoning would be entirely persuasive. But in fact the Governor has unfettered discretion to renew or not to renew, for any reason or for no reason. That being the case, existing rights of absent tribes are not implicated by resolution of this dispute. Therefore, *Makah Indian Tribe v. Verity*, 910 F.2d 555, 559 (9th Cir.1990), which held that a tribe with treaty rights was not a necessary party to litigation seeking prospective changes in the administrative process for determining ocean fishing rights, controls rather than *Kescoli v. Babbitt*, 101 F.3d 1304, 1309–10 (9th Cir.1999), and *Clinton v. Babbitt*, 180 F.3d 1081, 1089 (9th Cir.1999), in both of which changes were sought in the terms of existing agreements to which tribes were parties. Accordingly, I would hold that the compacting tribes are not necessary (thus not indispensable) parties for the reasons stated by the district court. *American Greyhound Racing, Inc. v. Hull*, 146 F.Supp.2d 1012, 1042–1049 (D.Ariz.2001).